**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GENEVA WAGNER, | ) | CASE NO. 1:11-cv-2140 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Geneva Wagner ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying her

application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. § 1381 et seq.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned United States Magistrate Judge pursuant

to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For

the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On December 15, 2008, Plaintiff protectively filed an application for SSI and

alleged a disability onset date of September 20, 1999.  (Tr. 13.)  Her application was

denied initially and upon reconsideration, so she requested a hearing before an

administrative law judge ("ALJ").  (Tr. 13.)  On March 22, 2011, an ALJ held Plaintiff's

hearing.  (Tr. 13.)  Plaintiff appeared, was represented by an attorney, and testified.

(Tr. 13.)  A medical expert ("ME") and vocational expert ("VE") also appeared and

testified.  (Tr. 13.)  On April 29, 2011, the ALJ found Plaintiff not disabled.  (Tr. 28.)  On

September 12, 2011, the Appeals Council declined to review the ALJ's decision, so the

ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On October 11, 2011, Plaintiff filed her complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  On March 25, 2012, Plaintiff filed her Brief

on the Merits.  (Doc. No. 14.)  On May 1, 2012, the Commissioner filed his Brief on the

Merits.  (Doc. No. 15.)  Plaintiff did not file a reply brief.

Plaintiff asserts three assignments of error:  (1) the ALJ improperly assessed

Plaintiff's credibility; (2) the ALJ improperly evaluated the opinions of nurse practitioner

Ms. Danielson and state agency reviewing physician Dr. Hoyle; and (3) the ALJ did not

cite or explain any medical opinions in support of his decision.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 37 years old on the date she protectively filed her application for

SSI.  (Tr. 27.)  She had at least a high school education and was able to communicate

in English.  (Tr. 27.)  She did not have any past relevant work experience.  (Tr. 27.)

### B.    Relevant Medical Evidence

#### 1.    Physical Impairments

Plaintiff has a history of chronic low back pain.  The only medication that she

2

took for this condition was Aleve.  (Tr. 58.)  Plaintiff concedes there is no evidence of

doctor's visits or other treatment for back pain during the relevant time period.

On April 28, 2009, Dr. Kimberly Togliatti-Trickett, M.D., performed a consultative

physical examination of Plaintiff on behalf of the Bureau of Disability Determination and

indicated that Plaintiff reported the following.  (Tr. 280-87.)  Plaintiff suffered pain

related to an automobile accident that occurred when she was 13 years old, and that

pain limited her ability to return to work.  (Tr. 285.)  She required four surgeries on her

right leg, and her right knee sometimes "gave out" when she stood or walked.  (Tr. 285.)

She also suffered right knee, ankle, and hip pain.  (Tr. 285.)  She rated her pain at

between 7 and 9 on a scale to 10 in severity.  (Tr. 285.)  Her "back aggravation" limited

her sitting to 20 minutes; she could stand for only 20 minutes because of ankle and

knee pain; she could walk one quarter of a mile; and she could lift no more than 5

pounds.  (*See* Tr. 285.)  She also was being treated for post-traumatic stress disorder

("PTSD"), anxiety, and depression.  (Tr. 285.)  She had not worked since 1999.  (Tr.

285.)

Dr. Togliatti-Trickett further indicated the following upon physical examination.

Plaintiff's spine alignment was intact, but her left pelvis was higher than her right pelvis.

(Tr. 286.)  She did not exhibit tenderness with palpation over the lumbosacral spine.

(Tr. 286.)  Range of motion in the cervical spine was within functional limits.  (Tr. 286.)

Range of motion in all of her extremities was within normal limits; and she had full

motor strength and sensation in all four extremities.  (Tr. 286.)  She was unable to walk

on her heels and toes because she suffered pain in her right lower extremity; and she

refused to squat because she suffered pain and she did not squat at home.  (Tr. 287.)

3

Dr. Togliatti-Trickett diagnosed Plaintiff with a leg length discrepency, knee strain, and low back pain.  (Tr. 287.)  Dr. Togliatti-Trickett further assessed Plaintiff's functional capacity as follows.  Plaintiff "should be able to stand and walk for at least 4-6 hours at a time," and "[t]here should be no problem with sitting."  (Tr. 287.)  She "should be able to lift and carry objects up to 30-40 pounds on occasion, without difficulty."  (Tr. 287.)  Plaintiff's physical impairments "could be medically managed to help decrease the pain."  (Tr. 287.)  Moreover, she had "no problem hearing, seeing, speaking, traveling, or handling objects."  (Tr. 287.)

On July 28, 2009, state agency reviewing physician Diane Manos, M.D., assessed Plaintiff's physical residual functional capacity ("RFC") and indicated the following.  (Tr. 313-20.)  Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; and sit, stand, and walk for about 6 hours in an 8-hour workday with normal breaks.  (Tr. 314.)  Her abilities to push and pull were not limited except to the extent she was limited in lifting and carrying.  (Tr. 314.)  She could frequently climb ramps and stairs and stoop, kneel, and crawl.  (Tr. 315.)  She could occasionally climb ladders, ropes and scaffolds and balance.  (Tr. 315.)  She could never crouch.  (Tr. 315.)  She had no manipulative, visual, communicative, or environmental limitations.  (Tr. 316-17.)

### 2.    Mental Impairments

On March 23, 2007, Dr. Ronald G. Smith, Ph.D., performed a consultative psychological evaluation of Plaintiff.  (Tr. 245.)  Dr. Smith indicated that Plaintiff reported the following.  Plaintiff had experienced traumatic events in her life:  she was raped at knife point at age 18; she experienced a house fire in 1999; her father died in 2000, and her sister was murdered in a nursing home is 2002.  (Tr. 246.)  She worked

4

as a secretary after high school; and she quit her most recent job as a bartender in 1999 because it was hard on her back.  (Tr. 246.)  She had nightmares, but Risperdal inhibited them and allowed her to sleep.  (*See* Tr. 247.)  Her psychological symptoms improved with her medication; she did not cry or have suicidal thoughts when she took her medication.  (*See* Tr. 247.)  She spent a lot of time "online" and played "Spades" with an online group.  (Tr. 247.)  Back pain and problems with her right ankle prevented her from vacuuming; and she could not do laundry because she could not bend.  (Tr. 247-48.)  She sometimes cooked meals, but her mother washed the dishes.  (*See* Tr. 248.)  She rarely "went out" and she did not shop often.  (Tr. 248.)  She also did not read often, as she had a poor attention span.  (*See* Tr. 248.)

Dr. Smith further indicated the following upon examination.  Plaintiff was cooperative; well-organized in her thinking; had an appropriate affect; was alert, well-oriented, and in good contact with reality; and performed well on memory and concentration tests.  (Tr. 248.)  Dr. Smith diagnosed Plaintiff with PTSD and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 54.[1]  (Tr. 249.)  Plaintiff's ability to maintain concentration and attention and relate to the public, coworkers, and supervisors appeared to improve with medication.  (Tr. 248.)  However, Plaintiff's ability to follow simple one- or two-step job instructions would still be "quite limited" because she had only recently re-started psychiatric treatment.  (Tr. 248.)

---

[1]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

5

Plaintiff began undergoing treatment at the W.G. Nord Mental Health Center ("the Nord Center") in February of 2009.[2]  (Tr. 332.)  On June 3, 2009, Plaintiff's "primary provider" indicated that Plaintiff reported she engaged in activities such as raising her children, caring for her mother, and going camping and to baseball games with her boyfriend.  (Tr. 328.)

On June 9, 2009, Dr. Smith performed another consultative psychological evaluation of Plaintiff and indicated that Plaintiff reported the following.  (Tr. 288-94.) Plaintiff saw a psychiatrist and a counselor at the Nord Center once a month.  She felt depressed, but she did not have suicidal or homicidal thoughts.  (Tr. 291.)  She initially stated that she had panic attacks "once an hour," but when Dr. Smith challenged this statement, Plaintiff clarified that she worried a lot and might have panic attacks twice a day.  (Tr. 291.)  Her medications were helpful; for example, when she had panic attacks she took two Clonazepam and became calm.  (Tr. 290.)  She was able to go to the store, but she became nervous around people in public.  (Tr. 291.)  Her other activities included swimming in a pool, sitting outside, watching her kids, grilling hot dogs and hamburgers, and watching television.  (Tr. 292.)  She slept between 8 and 12 hours each night and had nightmares every night.  (Tr. 292.)  She did not like doctors, and she was afraid of them because a doctor failed to give her sister medication while her sister was in a nursing home and her sister died.  (Tr. 289-90.)

Dr. Smith reported upon examination that Plaintiff was well oriented, alert, in

---

[2] The treatment notes from the W.G. Nord Mental Health Center, including the signatures of those who attended to and counseled Plaintiff, are largely illegible.

good contact with reality, and had poor insight but fair judgment.  (Tr. 292.)  Dr. Smith

diagnosed Plaintiff with major depressive disorder, recurrent and in partial treatment

remission, and assigned Plaintiff a GAF score of 55.  (Tr. 292-93.)  Dr. Smith concluded

that Plaintiff was moderately impaired in her abilities to:  relate to others in a job

situation including fellow workers, supervisors, and the general public; maintain

attention, concentration, and persistence in the performance of routine tasks; and

withstand the stress and pressure of day-to-day work activity.  (Tr. 293.)  However,

Plaintiff's ability to understand, remember, and follow instructions did not appear to be

impaired.  (Tr. 293.)

On July 6, 2009, state agency reviewing psychologist Tonnie Hoyle, Psy.D.,

performed a Psychiatric Review Technique and assessed Plaintiff's mental RFC.  (Tr.

295-312.)  In the Psychiatric Review Technique, Dr. Hoyle evaluated Plaintiff under

Listing 12.04 regarding affective disorders and found that Plaintiff had mild restriction in

her activities of daily living; moderate restrictions in maintaining social functioning;

moderate restrictions in maintaining concentration, persistence, or pace; and no

episodes of decompensation of extended duration.  (Tr. 309.)   Dr. Hoyle indicated the

following in his mental RFC assessment.  Plaintiff had a marked limitation in her ability

to interact appropriately with the general public, but otherwise had no more than

moderate limitations.  (Tr. 295-96.)  She had a long history of filing applications for

disability benefits; and she was not fully credible because her allegations of the severity

of her symptoms were not fully consistent with her treatment notes and the consultative

examiner's evaluation.  (Tr. 298.)  Dr. Hoyle concluded that Plaintiff "is capable of

performing routine repetitive tasks in an environment that is relatively static and

7

predicable and does not require contact with the general public." (Tr. 298.)

On August 28, 2009, Plaintiff presented to the Nord Center for follow-up counseling. (Tr. 321.) The individual who attended to Plaintiff indicated that Plaintiff reported some anxiety related to the start of her children's school year; and that Plaintiff's mood was euthymic, her affect was full, her thoughts were linear, she had no psychosis, her hygiene and eye contact were fair, and she was pleasant. (Tr. 321).

On September 15, 2009, Plaintiff cancelled her appointment at the Nord Center because her daughter was ill. (Tr. 363.) On October 27, 2009, Plaintiff failed to present to her appointment. (Tr. 362.)

On December 7, 2009, Plaintiff presented to Ms. Judy Hyde, LPCC-S, at the Nord Center for counseling. (Tr. 360.) Ms. Hyde indicated that Plaintiff was slightly irritable and demanding, and that Plaintiff reported the following. (Tr. 360.) Plaintiff missed her appointment with "Dr. Paras," and she was not taking her medication. (*See* Tr. 360.) She further stated "I want social security and don't have a doctor," and "I need to get back on my medication." (Tr. 360.) She had problems with her legs, which were caused by an accident when she was 13 years old; and she could not work because of her physical health and because she could not get along with other people. (Tr. 360.)

On January 13, 2010, Plaintiff presented to Nancy Danielson, APRN, CNS, at the Nord Center for counseling. (Tr. 358.) Ms. Danielson indicated that Plaintiff was oriented, had good hygiene, did not report any suicidal or homicidal ideation, and understood the information given to her about her symptoms and treatment plan. (Tr. 358.)

On January 14, 2010, Plaintiff and her boyfriend presented for counseling to

8

discuss Plaintiff's mood, behavior, arguments at home, and lack of discipline.  (Tr. 357.)
The counselor who attended to Plaintiff indicated the following.  (Tr. 357.)  Plaintiff
denied wanting to work and was applying for social security.  (Tr. 357.)  She admitted
that she was able to go on trips, took her children snowboarding, and hosted a
"party/family get-together."  (Tr. 357.)

On April 21, 2010, Plaintiff presented to Ms. Danielson for counseling.  (Tr. 352.)
Ms. Danielson indicated that Plaintiff appeared oriented with a spontantous affect,
slightly rapid but unpressured speech, good hygiene, good grooming, and good eye
contact.  (*See* Tr. 352.)  Ms. Danielson further indicated that Plaintiff reported the
following.  She was "very stressed about finances."  (Tr. 352.)  She also was in the
process of moving to Tennessee with her mother and step-brother, and her mind was
"racing [with] concerns about moving."  (Tr. 352.)  Computer games helped relieve her
stress.  (*See* Tr. 352.)  She also took Klonopin during the day and wanted an increased
dose.  (Tr. 352.)  Ms. Danielson indicated that she refused to increase Plaintiff's dose of
Klonopin because it was an addictive substance.  (Tr. 352.)  Ms. Danielson continued
Plaintiff on Prozac, Trazodone, Klonopin for anxiety, and Risperdal; and she indicated
that Plaintiff did not report side effects from her medication.  (Tr. 352.)

On July 13, 2010, Ms. Danielson authored a medical source statement and
indicated the following.  (Tr. 364-65.)  Plaintiff had between a "poor" and "fair" ability to
work in coordination with or proximity to others without being unduly distracted or
distracting, and to deal with work stress.  (Tr. 364.)  She had a "fair" ability to respond
appropriately to changes in routine settings.  (Tr. 364.)  She had between a "fair" and
"good" ability to follow work rules; use judgment; maintain attention and concentration

9

for extended periods of 2-hour segments; maintain regular attendance and be punctual within customary tolerances; deal with the public; relate to co-workers; interact with supervisors; function independently without special supervision; complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out detailed and complex job instructions; socialize; behave in an emotionally stable manner; relate predictably in social situations; manage funds and schedules; and leave home on her own.  (Tr. 364-65.) She had a "good" ability to understand, remember, and carry out simple job instructions and maintain her appearance.  (Tr. 365.)

Ms. Danielson further indicated the following.  Plaintiff recently suffered an exacerbation in her PTSD, the symptoms of which included nightmares, flashbacks, intrusive thoughts, and hypervigilance that interfered with her abilities to problem-solve and stay focused.  (Tr. 365.)  She was easily overwhelmed and suffered depressive symptoms.  (Tr. 365.)  Her symptoms restricted her ability to function in a competitive work environment and were "refractory" to medication.  (Tr. 365.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Hearing Testimony

Plaintiff testified at her hearing as follows.  She lived with her two teenage children and her 78-year-old mother.  (Tr. 38-39.)  She cared for her mother, who had dementia.  (Tr. 39.)  She did some cooking and cleaning with the help of her children and their father.  (Tr. 40.)  She was unable to work because she "hated" people and did

not enjoy leaving her house.  (Tr. 41.)  She could walk for only 15 minutes before her

ankles began to swell; and she did not "do well" outside her home.  (Tr. 41).  Her

various musculoskeletal problems also contributed to her inability to work.  (Tr. 41-42).

Although she used to take medication, at the time of her hearing she was not taking

medication and was "in transition of moving from the Nord Center to somewhere closer

to [her] home," which was "why [she was] not doing so well right now."  (Tr. 57.)

### 2.    Medical Expert's Testimony

The ME testified at Plaintiff's hearing as follows.  Plaintiff's "severe" impairments

were chronic low back pain, right knee strain, right leg length discrepancy, depressive

disorder, and PTSD.  (Tr. 55-56.)  Plaintiff did not meet or equal any of the listed

impairments.  (Tr. 60.)  The ME concurred with the state agency psychologist's

assessment that Plaintiff was mildly limited in her of activities of daily living, moderately

limited in her social functioning, and moderately limited with regard to her concentration,

persistence or pace.  (Tr. 61.)  In short, Plaintiff was capable of performing work at the

medium exertion level.  (Tr. 61-62.)  The ME further concurred with the other physical

limitations found by Dr. Manos.  (Tr. 62.)  Plaintiff's alleged swollen ankles would not

sufficiently impact her ability to stand and walk; and Plaintiff's alleged paranoia would

probably not impose any limitations on her ability to work if she were compliant with her

medication.  (Tr. 63.)

The ALJ asked whether the ME agreed with Ms. Danielson's assessment of

Plaintiff in her medical source statement, and the ME responded that Ms. Danielson's

assessment was "reasonable."  (Tr. 64.)

11

### 3.    Vocational Expert's Hearing Testimony

The VE indicated that Plaintiff did not appear to have any past relevant work

experience.  The ALJ posed the following hypothetical to the VE:

> [A]ssum[e] somebody of the claimant's age, education and work experience
> who is able to do a medium level of work limited to frequently climbing ramps
> and stairs, occasionally climbing ladders, ropes or scaffolds, frequently
> balancing, occasionally stooping, kneeling, crouching and crawling.  Limited
> to simple, routine, repetitive tasks, precluded from tasks that involve high
> production quotas or strict time requirements, precluded from tasks that
> involve arbitration, negotiation or confrontation.  Precluded from tasks that
> involve directing the work of others or being responsible for the safety of
> others.  Limited to tasks that involve superficial interaction with coworkers
> and the public and . . . precluded from commercial driving.

(Tr. 67-68.)  The VE testified that such a person perform other work as a linen room

attendant (for which there were approximately 500 jobs in northeast Ohio, 1,600 jobs in

Ohio, and 40,000 jobs in the national economy), laboratory equipment cleaner (for

which there were approximately 500 jobs in northeast Ohio, 2,000 jobs in Ohio, and

50,000 jobs in the national economy), and dining room attendant (for which there were

approximately 2,500 jobs in northeast Ohio, 8,000 jobs in Ohio, and 270,000 jobs in the

national economy).  (Tr. 68-69.)

The ALJ posed a second hypothetical to the VE that was identical to the first

except that the hypothetical person was limited to light work.  (Tr. 69.)  The VE testified

that such a person could perform other work as a "cashier II" (for which there were

approximately 11,000 jobs in northeast Ohio, 68,000 jobs in Ohio, and 1.7 million jobs

in the national economy), housekeeping cleaner (for which there were approximately

3,000 jobs in northeast Ohio, 14,000 jobs in Ohio, and 440,000 jobs in the national

economy), and sales attendant (for which there were approximately 2,000 jobs in

12

northeast Ohio, 11,000 jobs in Ohio, and 320,000 jobs in the national economy).  (Tr. 69.)

The ALJ posed a third hypothetical to the VE that was identical to the first except that the hypothetical person was limited to sedentary work.  (Tr. 69.)  The VE testified that such a person could perform other work as an addresser (for which there were approximately 850 jobs in northeast Ohio, 2,000 jobs in Ohio, and 70,000 jobs in the national economy), charge account clerk (for which there were approximately 350 jobs in northeast Ohio, 1,100 jobs in Ohio, and 35,000 jobs in the national economy), and order clerk (for which there were approximately 250 jobs in northeast Ohio, 700 jobs in Ohio, and 20,000 jobs in the national economy).  (Tr. 69-70.)

The ALJ posed a fourth hypothetical wherein he asked whether there would be any jobs for the first three hypothetical people if they were required to miss four days of work a month.  (Tr. 70.)  The VE responded that there would be no jobs for such a hypothetical person.  (Tr. 70.)

Plaintiff's attorney asked whether a hypothetical person who was off task 20 percent of the time could perform any jobs.  (Tr. 70.)  The VE responded that there would be no jobs for such a person.  (Tr. 70.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

14

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since December 15, 2008, the alleged onset date.

2.    The claimant has the following severe impairments: major depressive disorder, degenerative disc disease of the lumbar spine at L5-S1, posttraumatic stress disorder/anxiety disorder, right leg length discrepancy and knee strain.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work . . . except that she is nonexertionally limited to occasionally climbing ladders, ropes and scaffolds and occasionally stooping, kneeling, crouching and crawling. She can frequently climb ramps and stairs and frequently balance. She is unable to perform commercial driving. From a nonexertional standpoint due to her mental impairments, the claimant is limited to simple, routine and repetitive tasks. She cannot perform tasks that involve[] arbitration, negotiation or confrontation. She is limited to tasks that involve only superficial interactions with coworkers and the public. Moreover, she is precluded from tasks that involve directing the work of others or involve being responsible for the safety of others.

5.    The claimant does not have any past relevant work.

. . . . .

8.    The claimant does not have any past relevant work; therefore, she does not have any transferable work skills.

9.    Considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.

10.   The claimant has not been under a disability, as defined in the Social Security Act, since December 15, 2008, the protective filing date [of] her application.

(Tr. 15-28.)

15

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.    The ALJ's Assessment of Plaintiff's Credibility

Plaintiff contends that the ALJ improperly assessed her credibility because:

16

- The ALJ "did not assess the majority" of the factors listed in Social Security Ruling 96-7p;

- Some of the ALJ's reasons for finding Plaintiff less than fully credible are unclear; and

- The ALJ reviewed the record evidence in a selective manner to find that Plaintiff was not fully credible.

For the following reasons, this assignment of error is not well taken.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983). Sometimes, an individual's symptoms can suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone; accordingly, the ALJ must consider, in addition to the objective medical evidence, the following:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

17

6. Any measures other than treatment the individual uses or has used to
   relieve pain or other symptoms (e.g., lying flat on his or her back,
   standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and
   restrictions due to pain or other symptoms.

S.S.R. 96-7p, 1996 WL 374186, at *3 (S.S.A.) (citing 20 C.F.R. 404.1529(c) and

416.929(c)).  The ALJ also must provide an adequate explanation for his credibility

determination:

> The finding on the credibility of the individual's statements cannot be based
> on an intangible or intuitive notion about an individual's credibility. The
> reasons for the credibility finding must be grounded in the evidence and
> articulated in the determination or decision. It is not sufficient to make a
> conclusory statement that "the individual's allegations have been considered"
> or that "the allegations are (or are not) credible."  It is also not enough for the
> adjudicator simply to recite the factors that are described in the regulations
> for evaluating symptoms. The determination or decision must contain specific
> reasons for the finding on credibility, supported by the evidence in the case
> record, and must be sufficiently specific to make clear to the individual and
> to any subsequent reviewers the weight the adjudicator gave to the
> individual's statements and the reasons for that weight.

Id.

Here, the ALJ discussed the objective medical evidence of Plaintiff's physical

impairments and concluded that "the claimant's allegations are not reasonably

consistent with" that evidence.[3]  (Tr. 22.)  The ALJ further stated that he "also

considered the criteria of Social Security Ruling 97-7p and the symptom regulation as

they pertain to [Plaintiff's] self-described degree of chronicity of symptoms[,] self-

described functional limitations[,] and[] self-described reduced activities of daily living."

(Tr. 22.)  The ALJ explained that "there are other factors more directly related to the

_____

[3] Specifically, the ALJ discussed Dr. Togliatti-Trickett's findings.  (Tr. 22.)
Plaintiff concedes that "[l]argely, the claim file lacks objective evidence."  (Pl.'s
Br. 8.)

18

subjective standards for the evaluation of symptoms that do not support [Plaintiff's]

allegations":

- Plaintiff used only over-the-counter Aleve for her alleged pain and other physical symptoms, and the record failed to show that she used or required stronger medication or other treatment for her alleged pain and other physical symptoms.

- The record failed to establish that Plaintiff had any ongoing treatment relationship with a physician for her alleged pain and other physical symptoms.

- Plaintiff's mental health treatment was mainly conservative in nature, as it consisted of only psychotropic medication and outpatient therapy.  Her therapy sessions were "only generally scheduled [at] well spaced intervals," and the record lacked any evidence of emergency room treatment or periods of hospitalization related to her mental impairments.

- Records from the Nord Center revealed that although Plaintiff reported severe anxiety related to caring for her mother, Plaintiff indicated that she wanted to continue caring for her mother, planned to take her mother with her to Tennessee, and "denied any safety factors needing addressing."

- There was evidence that Plaintiff was non-compliant with her mental health treatment, as treatment notes from the Nord Center indicated that Plaintiff had missed multiple appointments, ran out of medication during those lapses in attendance, was advised to resume her medication and remain compliant, and Plaintiff continued to miss appointments and run out of medication.

- A treatment note from the Nord Center dated December 1, 2008, indicated that Plaintiff's counselor "questions possible malingering for secondary gain."

- Plaintiff reported in December 2009 and January 2010 that she did not want to work and wanted social security disability benefits.

(Tr. 22-24.)  A review of the ALJ's opinion shows that the ALJ considered most, if not

all, of the factors listed in Social Security Ruling 96-7p.

Plaintiff asserts that the ALJ was not clear why Plaintiff was less credible for

obtaining only psychotropic medication and counseling for her mental impairments, and

for desiring to continue caring for her mother despite suffering anxiety from doing so. The Court disagrees.  It is clear that the ALJ found Plaintiff less than fully credible because the evidence supported the conclusion that Plaintiff was not as limited as she claimed, in part because her impairments appeared well-controlled with non-intensive treatment and Plaintiff engaged in activities that belied the alleged severity of her symptoms.

Finally, Plaintiff asserts that the ALJ selectively reviewed the evidence because he failed to address the following evidence that appears to support Plaintiff's allegations:

- X-rays revealed that Plaintiff suffered "a condition of the back," which could reasonably have caused back and leg pain.

- Dr. Togliatti-Trickett indicated that Plaintiff had a reduced range of motion in her lumbar spine, knee pain, and an inability to walk heel to toe secondary to pain in her right lower extremity.

- Ms. Danielson indicated that Plaintiff's mental condition was refractory to medication.

- The record shows that Plaintiff had difficulty keeping appointments within the context of suffering anxiety, a desire to isolate herself, and a fear of doctors.

(Pl.'s Br. 8-9.)  This assertion lacks merit.  The ALJ considered most, if not all, of this evidence.  Further, an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party; and an ALJ need not make explicit credibility findings as to each bit of conflicting testimony so long as his factual findings as a whole show that he implicitly resolved such conflicts.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)).  Here, although the ALJ

did not specifically indicate that Dr. Togliatti-Trickett reported Plaintiff was unable to walk heel-to-toe during her examination secondary to pain in her right lower extremity, he observed that Dr. Togliatti-Trickett nevertheless concluded Plaintiff should be able to stand and walk for at least 4 to 6 hours at a time, and he gave that conclusion weight because it was consistent with all of the other medical source evidence.  (*See* Tr. 26.) Finally, Plaintiff's suggestion that she missed her appointments because of her anxiety, desire to isolate herself, and was afraid of doctors in unsupported by the record and is merely speculative.

The ALJ's assessment of Plaintiff's credibility was thorough, sufficiently clear, and reasonably supported by the record; and Plaintiff cites no legal authority that supports the proposition that the ALJ should have provided additional or more detailed explanations in this case.  Accordingly, and for the foregoing reasons, Plaintiff's contention that the ALJ improperly assessed her credibility is not well taken.

### C.      The ALJ's Assessment of the Medical and Other Sources

Plaintiff contends:  (1) the ALJ "discredited" Ms. Danielson's and Dr. Hoyle's opinions[4] without a "proper evaluation" of the nature and extent of their treatment relationship with Plaintiff, the supportability of their opinions, and the consistency of their opinions with the rest of the record evidence pursuant to the "treating physician rule"; and (2) the ALJ did not cite or explain any medical opinions to support his

---

[4] Plaintiff specifically asserts that the ALJ improperly discredited Dr. Hoyle's opinion that Plaintiff was "markedly impaired in the area of social functioning." Dr. Hoyle did not render this opinion; rather, he checked a box on his evaluation form indicating that Plaintiff was markedly limited in her ability to interact appropriately with the general public, but concluded that she had moderate restrictions in maintaining social functioning.

21

decision.  For the following reasons, these contentions are not well taken.

As an initial matter, Plaintiff provides absolutely no explanation of how the ALJ's assessments of Ms. Danielson's and Dr. Hoyle's opinions were deficient.  Moreover, Plaintiff provides no legal basis to conclude that the ALJ should have assessed Ms. Danielson's and Dr. Hoyle's opinions as treating source opinions.  Indeed, Ms. Danielson, as a nurse practitioner, does not qualify as a treating source, Social Security Ruling 06-03p, 2006 WL 2329939, at *2 (S.S.A.); and Dr. Hoyle had no treatment relationship with Plaintiff, as he was a state agency reviewing physician.

Nevertheless, the ALJ recognized that Ms. Danielson qualified as an "other source" under the Social Security regulations and discussed her opinions at length.  (Tr. 24-25.)  The ALJ explained that Ms. Danielson worked at the Nord Center and authored a medical source statement regarding Plaintiff's condition, but that he did not give weight to Ms. Danielson's opinions because:  her findings appeared to be based largely on Plaintiff's subjective statements; her conclusions were inconsistent with her findings regarding Plaintiff's functional abilities; and her observation that Plaintiff's symptoms were refractory to medication was contradicted by other treatment notes from the Nord Center indicating that Plaintiff benefitted from medication and suffered no side effects, as well as by Dr. Smith's notes indicating that Plaintiff reported her panic attacks resolved with Clonazepam.  (*See* Tr. 24-25.)

Although the ALJ did not mention Dr. Hoyle by name, he directly addressed Dr. Hoyle's opinion:  the ALJ stated that (1) he gave weight to the state agency psychological consultants' opinion that Plaintiff was capable of performing routine repetitive tasks in an environment that was relatively static and predicable and did not

22

require contact with the general public, but (2) the overall weight of the evidence concerning Plaintiff's social functioning established that Plaintiff was able to interact with the public on at least a superficial basis.  (Tr. 26.)

A review of the ALJ's decision supports the conclusion that the ALJ considered the nature and extent of Ms. Danielson's and Dr. Hoyle's treatment relationships with Plaintiff, the supportability of their opinions, and the consistency of their opinions with the rest of the record evidence; and Plaintiff utterly fails to show how the ALJ's assessments of those opinions were deficient.

Finally, Plaintiff's contention that the ALJ did not cite or explain any medical opinions to support his decision lacks merit.  A review of the ALJ's decision shows that the ALJ directly discussed the opinions of Dr. Hoyle, Dr. Smith, Dr. Togliatti-Trickett, and the ME[5] and relied on those opinions, as well as the record as a whole, to determine Plaintiff's RFC.  (Tr. 25-26.)  Accordingly, and for the foregoing reasons, Plaintiff's contentions are not well taken.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  July 24, 2012

_____

[5]  Plaintiff notes that the ME testified Ms. Danielson's assessment was "reasonable."  Plaintiff does not, however, explain the significance of this fact; and the Court observes that the ME did *not* state that he agreed with the assessment.

23